In Re the Marriage of Sharon K. KORN, Appellant,

v.

Michael B. KORN, Defendant.

No. 10771.

Missouri Court of Appeals, Southern District, Division One.

June 29, 1979.

L. Thomas Elliston, Elliston & Webster, Webb City, for appellant.

Phillip A. Glades, Joplin, for respondent.

JAMES H. KEET, Jr., Special Judge.

Appeal from judgment entered July 27, 1977, transferring custody of the parties' only child, Travis (age 6 at time of trial on July 26, 1977), from appellant (the mother, Sherry) to respondent (the father, Mike) and awarding her right of reasonable visitation and three months' summer temporary custody.

Review is under Rule 73.01 [1] as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[2]

The parties' first marriage ended in divorce in 1972, Sherry then being awarded custody. Their second marriage (the record does not show its date) was dissolved August 13, 1975, Sherry being awarded custody and the right to remove Travis to California and Mike being awarded right of reasonable visitation and two months' summer custody each year.

Shortly thereafter Sherry, with Mike's agreement, took Travis to California where they saw Mike Mitchell, whom Sherry then married. On September 21, 1975, Sherry went to Saudi Arabia with Mitchell and, again with Mike's consent,[3] took Travis with her. On November 4, 1975, separated from Mitchell, she returned and moved in with her mother for ten days and then got a job at a poultry processing plant in Monett, where she and Travis lived with a Debbie Garrett and her child.

In February and March, 1976, Sherry and Travis were ill and Sherry was in financial difficulties because she had had to replace certain clothing and housewares and bought a car and Mike had not timely paid the $15 per week child support set by the court. In April 1976, Sherry, giving Mike to believe she was going back to Saudi Arabia, entered the U. S. Army to have the security of a steady job and medical benefits for her and Travis. Her adopted father had been a career military person. She left Travis with her mother until she completed basic training. Several weeks later her mother turned Travis over to Mike, who had remarried in December 1975.

Mike at once filed his motion to modify, asking transfer of custody.[4] Upon Sherry's return from basic training in May 1976, he filed and served on her a motion for temporary custody and refused to let her have custody of Travis. Travis remained with Mike and his new wife, Lynn (with whom he had lived for three months before their marriage), until December 1976. He then began a stay with Sherry and her new husband, Sgt. Getty, a career soldier. Travis was with them in South Carolina (where they were stationed) until April 1977.[5]

The trial court found that each party loved Travis and was "capable of providing an adequate home"; that petitioner was a restless, aggressive personality and Mike rather calm and phlegmatic; that Travis had had some nervous problems brought on by unstable conditions under which he had lived since the dissolution; that Sherry had led a "very unstable life" but her enlistment in the Army "was a very positive step" which could lead to a great deal more

1. Unless otherwise indicated all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

2. The record being ample, we do not see fit to remand even though it is possible that substantial and material changes of condition may have occurred since time of trial (Cf. *B v. L*, 558 S.W.2d 738 (Mo.App.1977); *J-G-W- v. J-L-S-*, 414 S.W.2d 352 (Mo.App.1967) and the trial court did not order the welfare office or juvenile officer to exercise continuing supervision over the case pursuant to § 452.405 (Cf. *J-A-F-v. P-J-F-*, 552 S.W.2d 739, 741 (Mo.App.1977).

3. Pursuant to a stipulation for modification made after Sherry married Mitchell granting Sherry the right to remove Travis from Missouri, "to any other state within or without the continental United States" and Mike two months' summer custody each year, with Sherry to bear the cost of transporting Travis to and from Mike's residence. The record does not show filing of the stipulation or any court action on it. Mike testified Mitchell "was a very reputable person and I assumed that he would be good to Travis."

4. He alleged only his remarriage; a suitable home; Sherry's joining the armed forces, her whereabouts being unknown; and Travis' desire to continue to reside with Mike. The case was tried, in large measure, on his contention, made at trial, that Sherry was not a fit mother and that Travis had lived with her under unstable conditions.

5. A docket entry of December 8, 1976, reflects appearance of the parties and their attorneys and continuance of the hearing on the motion to modify pending home studies ordered that date by the court. The record is not express as to how it happened that Travis went to South Carolina, but it may be inferred that it was by agreement of the parties. Each home study "reflected a good home."

stability in her life, provided her present marriage is successful; and that Lynn was a good mother and with Mike was in a position to provide Travis a home where he has a father and mother and a little brother (Lynn's son by another marriage, named Paul, age 4 at time of trial, with whom Travis got along very well). Concluding that Travis "at the present time is very much in need of a calm, stable environment, and that this can best be provided by the Respondent," the court ordered Travis placed in Mike's custody and expressed the hope that by May 1978 "Travis will have matured and settled down enough that he can handle the change [to the summer custody awarded Sherry] without psychological disturbance."

■ Respondent had the burden of showing that facts arising since the prior decree had given rise to a change in circumstances of the child or his custodian and that a modification was necessary to serve the best interests of the child. § 452.410. The party originally awarded custody is prima facie capable of having custody. *Randle v. Randle*, 560 S.W.2d 876 (Mo.App. 1977). Compare Commissioners' Note to § 409, Uniform Marriage and Divorce Act. The trial court's judgment will not be set aside unless it is against the weight of the evidence or wrongly declares or applies the law. *In re the Marriage of B-A-S-*, 541 S.W.2d 762 (Mo.App.1976). This court has a duty to reach its own conclusion based on the law and the evidence and enter such judgment as the trial court should have entered. *In re Marriage of Zigler*, 529 S.W.2d 909 (Mo.App.1975). The trial court's decision should not be disturbed unless the best interests of the child require a different disposition. *In re Marriage of Powers*, 527 S.W.2d 949, 952 (Mo.App.1975).

■ The respondent urged at trial that he had remarried (such alone is not sufficient—*In re Marriage of Cook*, 532 S.W.2d 833, 836 (Mo.App.1976) and was able to provide Travis with a stable home life. These changes in *his* circumstances may be considered even though § 452.410 provides that the court may not modify a prior custody decree unless it finds that a change has occurred in the circumstances of the *child* or his *custodian*. *Randle*, supra, 560 S.W.2d at 878.

Appellant insists that the trial court's decision was against the weight of the evidence and wrongly applied the law. We disagree.

■ Stability of the child is an important factor to be considered in deciding custodial issues. *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304, 306 (Mo.App.1976); *Cook v. Lodes*, 560 S.W.2d 64, 67 (Mo.App.1977); *In re Marriage of Roedel*, 550 S.W.2d 208 (Mo. App.1977); *Johnson v. Johnson*, 526 S.W.2d 33, 37 (Mo.App.1975); Commissioners' Note to § 409 of Uniform Marriage and Divorce Act. The trial judge acted within his discretion in relying primarily on this factor. His conclusion that Travis at trial time very much needed a calm, stable environment and that such could be best provided by respondent is supported by credible evidence, even though there was credible evidence that would support a contrary conclusion.[6] Travis was in the custody of respondent and his wife a majority of the time after Sherry's mother turned Travis over to respondent. When Travis first came to live with respondent and his wife Travis was insecure and had problems controlling his bowels and was unable to sleep well. These problems cleared up after Travis had lived with respondent and did not recur until subsequent contact with appellant. Travis was doing well in school at Carthage and

**6.** The evidence is not persuasive that Sherry's conduct caused whatever nervous condition Travis may have had. There is evidence that she was a good, loving, dedicated, and concerned parent. Her mother's testimony that she was a bad mother to Travis is not persuasive. Mike conceded that Sherry had taken good care of Travis. His only criticism at trial was that she had left Travis alone with her mother while Sherry had gone out at nights and had failed to take care of Travis' daily needs. Her absence does not establish unfitness where, as here, the child is left with adequate care. (*Klaus v. Klaus*, 509 S.W.2d 479, 482 (Mo.App.1974); *Cook*, supra, 532 S.W.2d at 836.)

had the opportunity of visiting with his maternal grandmother and the paternal grandparents. If permanent custody were switched to appellant, Travis would be transferred from respondent's extensive custody and uprooted from the continuity of the stable environment in which he has been since April 1976.

Appellant relies greatly on *Klaus v. Klaus*, 509 S.W.2d 479 (Mo.App.1974), *In re Marriage of B-A-S-*, supra, and *In re Zigler*, 529 S.W.2d 909 (Mo.App.1975), characterized in *Shannon v. Shannon*, 550 S.W.2d 601, 604 (Mo.App.1977) as "an exceptional case." These cases lend substantial support to appellant's position. However, they are distinguishable in a number of respects, and do not persuade the court that it should reverse.

We recognize (as ably argued by appellant's counsel) that the pattern of custody following the dissolution, agreed to by respondent, should not lightly be disregarded (*B-A-S-*, supra, 541 S.W.2d at 768; *Zigler*, supra); that interference with visitation rights (there was evidence that Mike interfered when Sherry returned from basic training) is an important factor (*Randle*, supra, 560 S.W.2d at 879; *RLS v. JES*, 522 S.W.2d 5 (Mo.App.1975); *B-A-S-*, supra); that the presumption in favor of the mother is important as a factor to be weighed (*R-G-T- v. Y-G-T-*, 543 S.W.2d 330, 331 (Mo.App. 1976); *Pearson v. Pearson*, 575 S.W.2d 934 (Mo.App.1978)); and that appellant, originally awarded custody, is prima facie capable of having custody (*Randle*, supra; *Klaus*, supra); and that a parent who turns a child against the other parent may be denied custody (*B-A-S-*, supra, 541 S.W.2d at 768–769).[7]

We presume, and are persuaded from a close study of the transcript, that the trial court studied all of the evidence and decreed custody in the manner it believed would be best for Travis, *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304, 306 (Mo.App.1976); *Kanady*

*v. Kanady*, 527 S.W.2d 704, 708 (Mo.App. 1975). We give due regard to its opportunity to evaluate intangibles which do not appear in the record (*In re Marriage of Powers*, 527 S.W.2d 949, 952 (Mo.App.1975)). We are not convinced that the trial court's decree was against the weight of the evidence or wrongly applied the law or that the best interests of the child call for a different disposition.

The nature of the case and the considerable evidence in appellant's favor make our decision "difficult and soul-searching," as in our *In re Marriage of Chilton*, 576 S.W.2d 584, 585 (Mo.App.1979). Our review, including a consideration of the extent to which we should defer to the trial judge's findings and decision in this case, persuades us that his action should be affirmed. As stated in *Moore v. Moore*, 429 S.W.2d 794, 797 (Mo.App.1968):

"In child custody cases the trial judge rarely enjoys the luxury of deciding between a good choice and a bad one. More often he must make a decision between two poor choices or, almost as difficult, between two satisfactory choices. His decision is often influenced by the character of the parties and by their witnesses—factors more apparent to him than to us."

The judgment is affirmed.

FLANIGAN, C. J. and TITUS, J., concur.

CAMPBELL, Special Judge, concurs.

BARKER, Special Judge, dissents (dissenting opinion filed).

HENRY, Special Judge, concurs.

CHARLES V. BARKER, Special Judge.

I respectfully dissent. I have no disagreement with the law as declared in the majority opinion, nor do I disagree with the facts recited therein. However, I feel that several additional facts should be considered as will be noted herein. My disagreement is principally with the conclusions

---

7. The trial judge expressly noted this at trial but his "Memorandum of Court's Findings" did not express a finding of facts on it. There was credible evidence that Mike, upon Sherry's return from basic training, said some things (within the hearing of Travis) that strongly charged Sherry with not loving or wanting Travis.

reached. Conclusions that I feel are not supported by the evidence or the law.

As noted in the majority opinion these parties have been married and divorced on two occasions, and on both occasions custody of the child was awarded to appellant, apparently with the consent of respondent. That being so, if respondent wanted to obtain a modification of the decree whereby custody of the child was to be transferred to him, it was necessary for him to plead and prove a change of circumstances that would require or justify removing the child from the custody of appellant and placing the custody with him. I feel that respondent has totally failed to either plead or prove such change of circumstances.

The motion to modify alleges the following change of circumstances upon which respondent relies in seeking a modification:

5. That since the entry of the original decree of dissolution in August of 1975, the circumstances of the parties have changed as follows:

a. Petitioner has re-married and can provide the child with a two parent home.

b. Petitioner's present wife, Lynn L. Korn, desires to and is willing to care for the aforementioned child.

c. Petitioner owns a mobile home suitable for the need, comfort and joy of the said minor child.

d. [Appellant], Sherry K. Korn, has joined the Armed Services of the United States and her current whereabouts are unknown.

e. The said minor child is now living in the care and custody of petitioner Michael B. Korn and desires to reside with him.

There is no allegation that the best interest of the child would be served by granting a modification.

As noted in the majority opinion, that while the fact that respondent had re-married and can provide the child with a two parent home may be considered, it is not sufficient to justify modification. It is to be noted in passing that appellant has also re-married and is able to provide a two parent home.

I know of no authority holding that the claimed change of circumstances set out in sub-paragraphs b and c, if true, is sufficient to modify a decree.

The claimed change alleged in sub-paragraph e, while a matter to be considered, can hardly amount to a change of circumstances justifying a modification, particularly in view of the fact that the child was only six years of age at the time of the trial.

The only claimed change of circumstances that could possibly be interpreted as alleging facts that would justify a modification is sub-paragraph d. The allegation that appellant has joined the armed services alone is hardly sufficient to justify a modification in the absence of further allegations as to how the child could be adversely affected. It is common knowledge that literally thousands of parents are in the armed services and so far as I am aware no court has ever held that this in any manner renders them unfit parents, or that it is detrimental to the best interest of the child.

The allegation that appellant's current whereabouts is unknown, without further allegations as to how the child is adversely affected or some showing that appellant was deliberately concealing herself or failing to provide care for the child, would likewise, in my opinion, fail to allege any change of circumstances justifying a change of custody.

It is to be noted that the motion to modify fails to allege a single instance where the child has been mistreated, abused, neglected, abandoned or in any manner mistreated or that appellant's circumstances have in any manner changed so that the best interest of the child require the modification sought.

However, if we assume that the motion was sufficient, it is my opinion that the evidence was wholly insufficient to justify the modification.

As stated in the majority opinion, with which I agree, the law is that the party originally awarded custody is prima facie

capable of having custody. This should have even more cogent force in this case where custody was placed in the appellant on two separate occasions, the last time as a result of a joint petition filed by appellant and respondent. The majority opinion also notes that § 452.410 RSMo 1969· requires that the person seeking the modification has the burden of showing facts arising since the prior decree has ·given rise to a change of circumstances of the child or his custodian and that a modification was necessary to serve the best interest of the child. The courts have also squarely held that in order to modify a custody decree, the court must find: (1) facts arising since the prior decree have given rise to a change in circumstances of the child, or his custodian and (2) modification is necessary to serve the best interest of the child. *Cook v. Lodes*, 560 S.W.2d 64 (Mo.App.1977).

In this case the court requested the Missouri Division of Family Services to make a home study of both appellant and respondent. At the beginning of the hearing the parties, through their attorneys, stipulated that each home study reflected a good home and the court, in its findings, concluded that the parties conceded that the homes of both parties are suitable homes.

There is no credible evidence throughout the transcript that appellant did not have a good home for the child, or that she had ever abused, mistreated, or neglected him. Indeed, in response to a direct question, "Do you have any reason to believe Sherry would not be a proper person to have custody of this child?" respondent answered, "To my knowledge, the only reason is reactions that he had had when we have had him and she comes to get him and takes him back." These reactions were that he appeared mixed up after a visit with his mother and that he resumed messing his pants. Yet, respondent admits that Travis had had this problem for a long time, in fact, since he was old enough to start potty training some time before the divorce and that their doctor had informed them that some children had this problem but would outgrow it.

The transcript is totally barren of any evidence that appellant was any more the cause of this condition than respondent, or that the visits with appellant were more upsetting than having to return to respondent. The majority opinion in fact notes that the evidence is not persuasive that appellant's conduct caused whatever nervous condition Travis may have had.

The record also reflects that appellant had never denied respondent his visitation rights except during the time he was admittedly living out of wedlock with the person who is now his wife, and, in fact, appellant saw to it that the child not only could visit his father, but also his paternal grandparents.

On the other hand it seems to me that the conduct of respondent had left much to be desired.

He admittedly lived with his present wife, out of wedlock, from the month following the divorce until his marriage some months later. This conduct was in the presence of the small child of respondent's present wife and, while she may now be providing the proper care for the child, it is understandable how appellant is upset about having the care of her son entrusted to a woman who has participated in such an arrangement. It is further undisputed that respondent and his wife do not attend church and are not providing any religious training for the child.

The evidence further shows that respondent complained about appellant having many debts and that she joined the armed services to escape the debts. This complaint has an exceptionally hollow ring when the facts disclose that respondent did not keep his rather small child support payments current and that appellant, in fact, was compelled to have his wages garnished in order to collect the child support.

But perhaps the most serious misconduct of respondent is that he permitted or participated in conduct detrimental to the rights of the mother. On occasion the mother was denied the right to talk to Travis on the telephone; on at least two occasions the paternal grandmother (who has sued appel-

lant and in turn been sued by appellant) inquired of the child as to with whom he wanted to live. Respondent has denied her visitation with the child. A particularly revealing example is shown by the following testimony of appellant, which was not refuted and stands undisputed.

"Q. Have they ever prevented you from talking to Travis on the phone?

A. On many occasions.

Q. Sherry, there has been some mention and testimony made about Travis not being allowed to kiss you except through a screen door, do you recall that incident?

A. Yes, sir, I do very well.

Q. Would you tell the court about this?

A. I was—on a Wednesday I flew home and I was told, I called Tom's office because he was making the arrangements for me and they said I could pick up Travis that evening. Okay, I arrived in Carthage at about 5:00 or 6:00, and it was winter and I went over to Mick's house and I knocked on the door and it took about ten minutes for them to open it and I heard them say, 'Boys, go in the other room.' Okay, so Mick came to the door and he opened it. I said, 'I'm here to pick up Travis.' He said, 'You don't love him. You don't care for him. Why don't you just leave?' I said, 'I demand to see my son.' He said, 'You don't love him. Just leave.' I said, 'I want to see my son.' And he wouldn't let me, so I left. I went home. I went to Jeanette's house. I called my husband and told him what happened. He said go back there and take a witness so he can't say you weren't there. So I did exactly that. Jeanette went with me, Jeanette Hodson. I stood to the side of the door. I didn't feel he would open the door if he saw me there. He opened the door and I stepped in front. He said, 'What are you here for?' I said, 'I'm here for the same reason I was awhile ago, to pick up my son. I was told I could pick him up when I got here and I want him now,' and he wouldn't even let me see him. He said, 'You don't have any business here. You don't love him. Why don't you leave?' I said, 'I want to see my son and I am not leaving until I see him,' and finally Jeanette spoke up and she said, 'I am a witness to the fact that you are not letting her see him,' and at that point he said, 'Well, she can see him' and he let Travis come to the screen door and I said, 'Come here,' and the screen door was locked and he couldn't even come and kiss me, so then I asked him, I said, 'Do you want to kiss Momma?' and he said, 'Yes.' I said, 'Would you unlock the screen so he can kiss me?' and he said, 'No, he's not coming out.' And so I kissed him through the screen door and I said I loved him and I would come back tomorrow."

This conduct on the part of the respondent, in my opinion, is sufficient to show that the best interest of the child would not be served by granting the modification and in fact is a compelling reason why custody should be left with appellant.

The trial court found that "respondent's grounds for modification can be summed up in two general changes, one, that respondent has now re-married and is able to provide the child with a stable home life whereas, two, [appellant] has failed to provide a stable home life for the child."

The court specifically found that for "some six or eight months after the dissolution the [appellant] led a very unstable life. However, the court regards her enlistment in the Army as a very positive step and, provided her present marriage is successful, it could lead to a great deal more stability in her life." This is hardly persuasive that appellant's home, some year and a half later, is now unstable.

There is not one word of testimony that appellant does not now have a stable home where the child could live with his mother and step-father and half-sister.

The trial court, from observation of the parties, arrived at the conclusion that appellant has a restless, aggressive personality whereas respondent appears to be calm and phlegmatic. There is no testimony or evidence in the case upon which this conclusion could be based, and the matter is far too serious for a decision to be based in part on conclusions drawn by observing two people for a short time when both were obviously under stress. Outward appearances are often deceiving and the prevailing party should have something more substantial than who is the better actor or actress, or who can better withstand the stress with an outward appearance of equanimity.

However, if it be assumed that the conclusion is correct, there is no showing that the temperament of the parties have not always been the same and certainly no showing of any change in temperament of appellant.

Whatever the accuracy of the assessment of the situation made by the able and conscientious trial judge, the fact remains that the clear dictates of § 452.410 RSMo and the prior case law have not been met.

It is my opinion that the respondent failed to allege or prove any change of circumstance of the child or of his custodian or that any modification is necessary to serve the best interest of the child. Granting the modification without this showing is not permissible and would, in effect, be allowing the court hearing the motion to modify to substitute its judgment for the judgment of the court granting the original decree.

Upon the record now before us, I would reverse the decision of the trial court, leave custody with the appellant, and order the petition dismissed.